IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEONARD ELDRIDGE
  *Plaintiff*,

  *v.*

  Civil Action No. ELH-25-3627

BALTIMORE COUNTY,
MARYLAND
*et al.*,

  *Defendants*.

**MEMORANDUM OPINION**

While plaintiff Leonard Eldridge was a pretrial detainee at the Baltimore County Detention Center ("BCDC"), he was attacked twice by members of a gang known as Dead Man Inc. ("DMI"). According to Eldridge, two correctional officers, Hansel Simpson and Elischa Bryant, facilitated the attacks by providing members of DMI with access to Eldridge.

Through counsel, on June 7, 2025, plaintiff filed suit in the Circuit Court of Maryland for Baltimore County against defendants Simpson, Bryant, and Baltimore County, Maryland (the "County"). *See* ECF 2 ("Complaint"); ECF 11-2 (same). Simpson and Bryant removed the case to this Court on November 5, 2025, based on federal question jurisdiction. ECF 1 (Notice of Removal) (citing 28 U.S.C. §§ 1331, 1441(a); 42 U.S.C. § 1983); *see also* ECF 11, ECF 11-1 to ECF 11-40 (documents from case file in the Circuit Court for Baltimore County).

The Complaint contains eight counts. In Count I, lodged against all defendants, plaintiff asserts violations of Articles 16, 24, 25, and 26 of the Maryland Declaration of Rights. ECF 2, ¶¶ 81–106.[1]  Count II, asserted against the County, alleges negligent hiring, retention, training,

---

[1] Article 16 of the Maryland Declaration of Rights states, in part, that "no Law to inflict cruel and unusual pains and penalties ought to be made." Article 24 provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled,

and supervision. *Id.* ¶¶ 107–116. Count III, lodged against all defendants, asserts a claim for negligence and gross negligence. *Id.* ¶¶ 117–125. In Count IV, plaintiff asserts a claim for battery against all defendants. *Id.* ¶¶ 126–130. Count V names the County and asserts a claim for indemnification and seeks a declaratory judgment pursuant to State and federal law. *Id.* ¶¶ 131–145. Count VI, asserted against all defendants, is brought pursuant to 42 U.S.C. § 1983; plaintiff alleges that defendants failed to take reasonable measures to prevent the attacks of other inmates and inadequately responded to those attacks, in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution. *Id.* ¶¶ 146–154. In Count VII, filed against all defendants, pursuant to 42 U.S.C. § 1983, plaintiff asserts that he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment. *Id.* ¶¶ 155–164. Count VIII names all defendants and alleges, pursuant to 42 U.S.C. § 1983, that plaintiff was subjected to summary punishment and excessive force, in violation of the Fourth and Fourteenth Amendments. *Id.* ¶¶ 165–177.

Defendants have moved to dismiss the entire Complaint. ECF 7. The motion, which asserts multiple grounds for dismissal, is supported by a seven-page memorandum of law. ECF 7-1 (collectively, the "Motion to Dismiss"). First, defendants contend that Simpson and Bryant

---

or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Article 25 states: "[E]xcessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. . . ." Article 26 states: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." Articles 16 and 25 are construed *in pari materia* with the Eighth Amendment. *Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006). Articles 24 and 26 are the State constitutional counterparts to the Fourteenth and Fourth Amendments, respectively, and both provisions are ordinarily interpreted *in pari materia* with their federal analogs. *See, e.g., Littleton v. Swonger,* 502 Fed.Appx. 271, 274 (4th Cir. 2012) ("Articles 24 and 26 are construed *in pari materia* with the Fourth and Fourteenth Amendments of the U.S. Constitution").

are public officials and are therefore entitled to "common law public official immunity." *Id.* at 2.[2]
Second, defendants contend that the County is also entitled to public official immunity, pursuant
to the Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol, 2018 Supp.)
§§ 5-301 *et seq.* of the Courts & Judicial Proceedings Article ("C.J."), because the claims against
the County "are premised upon the conduct of County employees . . . ." *Id.* at 3.  Third, defendants
argue that, pursuant to the LGTCA, the County is entitled to governmental immunity with respect
to the tort claims.  *Id.* at 3.  In addition, defendants contend that they are entitled to qualified
immunity "as to all claims in the complaint and the complaint must be dismissed." *Id.* at 6.

Plaintiff opposes the Motion to Dismiss.  ECF 9.  Defendants did not reply.  *See* Docket.

Eldridge has moved to remand the case to State court.  *See* ECF 10.  The motion is
supported by a memorandum of law (ECF 10-1) (collectively, "Remand Motion").  Plaintiff also
submitted two exhibits: defendants' Notice of Removal and affidavits of service.  ECF 10-2, ECF
10-3.  In sum, Eldridge contends that Simpson and Bryant were served on August 8, 2025, and
therefore the removal on November 5, 2025, was untimely, pursuant to 28 U.S.C. § 1446(b).

Defendants oppose the Remand Motion (ECF 13), which is supported by a memorandum
of law (ECF 13-1) (collectively, "Remand Opposition").  They have also submitted the affidavits
of Simpson and Bryant, disputing service on August 8, 2025.  ECF 13-2 (Simpson); ECF 13-3
(Bryant).  As a supplement to their Remand Opposition, defendants also filed the Affidavit of
Pamela Sterrette, the correctional officer who accepted service of the suit on behalf of Simpson
and Bryant.  ECF 16.

---

[2] Throughout the Memorandum Opinion, the Court cites to the electronic pagination.
However, the electronic pagination does not necessarily correspond to the page number imprinted
on a particular submission.

Plaintiff has replied. ECF 18 ("Reply"). With his Reply, Eldridge includes the Affidavit of John McIntyre, the co-owner of the process service business that plaintiff engaged to serve defendants. ECF 18-1.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant plaintiff's request for limited discovery with regard to the Remand Motion. In light of this ruling, I shall defer ruling on the merits of the Remand Motion. And, pending resolution of the Remand Motion, I shall also defer ruling on the Motion to Dismiss.

## I. Factual Summary[3]

Eldridge entered BCDC as a pretrial detainee on May 27, 2022. ECF 2, ¶¶ 1, 19. He was housed in Cell 4 of the 4E Housing Unit. *Id.* ¶ 20. As alleged by Eldridge, he "was supposed to be housed in a different cell in the 4E Housing Unit, but Defendant Bryant put him into Cell 4 at the request of inmates at BCDC that were members of the notorious Dead Man Inc. Gang . . . ." *Id.* ¶ 21. Eldridge shared Cell 4 with an unidentified cellmate. *Id.* ¶ 27.

When Bryant assigned Eldridge to Cell 4 upon his arrival to BCDC, she "was aware that DMI Gang members intended to attack Plaintiff, who is black, as a result of his relationship with a white woman." *Id.* According to Eldridge, "DMI knew about the relationship of Plaintiff with a white woman and devised a plan to attack" him. *Id.* ¶ 22. Moreover, he asserts that, to carry out these plans, DMI received "help from correctional officers at BCDC . . . ." *Id.*

At approximately 8:00 p.m. on the night of June 9, 2022, Officers Johnson and Ayisire conducted "door checks" to "ensure[] that all the inmates on the bottom tier"—including Eldridge

---

[3] In connection with a motion to dismiss, the Court assumes the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019). The factual summary derives, in part, from plaintiff's Complaint. ECF 2. But, as discussed, *infra*, in connection with a motion to remand, the court is not limited to the content of the Complaint. Rather, it may consider evidence submitted by the parties. *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

in Cell 4—"were in their cells and their doors were locked." *Id.* ¶ 23. When the bottom tier inmates were locked inside their cells, BCDC policy permitted the inmates from the top tier "to be out of their cells for recreation at that time." *Id.* ¶ 24.

But, between 8:00 p.m. and 9:00 p.m., and "[a]t some point after Officers Johnson and Ayisire secured the bottom tier, Defendant Simpson opened all the bottom tier doors." *Id.* ¶ 25. Simpson's conduct "was against BCDC's policy" because "only one floor/tier was supposed to be out at a time." *Id.* Eldridge maintains that "Simpson's purpose in opening the bottom tier doors was to permit the first attack on Plaintiff." *Id.*

After plaintiff's cell door was opened, Eldridge "went down to Cell 9 to speak with another inmate." *Id.* ¶ 26. While Eldridge "was at Cell 9," another inmate "was seen exiting Plaintiff's cell." *Id.* ¶ 27. Eldridge describes this inmate as "a large, white male . . . with a white tank top and light-colored sweatpants and black shoes that was holding a beverage . . . ." *Id.* This inmate, referred to as "Inmate #1" throughout the Complaint, "was seen entering Plaintiff's cell again about a minute later and then exited again about ten seconds later, followed by Plaintiff's cellmate . . . ." *Id.* Eldridge describes Inmate #1 as "one of the leaders of the DMI Gang . . . ." *Id.* ¶ 43.

Plaintiff's cellmate then walked to Cell 9 to tell Eldridge "that he needed to speak with him." *Id.* ¶ 28. Eldridge followed his cellmate back to Cell 4, which "they entered . . . at approximately 9:32 p.m." *Id.* After Eldridge and his cellmate entered Cell 4, three male inmates "started gathering outside of the cell door and were obviously watching the door." *Id.* ¶ 29. Inmate #1 was one of the inmates. *Id.* Plaintiff refers to the other two inmates as "Inmate #2" and "Inmate #3." *Id.* This gathering, which was in violation of BCDC rules, allegedly "occurred in full view of Defendant Simpson, who was charged at the time with observing the tier and ensuring the safety of inmates like Plaintiff." *Id.*

5

"After a few minutes," Eldridge's cellmate began to attack him inside their cell.  *Id.* ¶ 30.  At approximately 9:40 p.m., when Eldridge attempted to escape the cell, Inmates #1, #2 and #3 entered the cell to "join[] in the attack."  *Id.* ¶¶ 30, 34.  Eldridge describes Inmate #2 as "short and stocky" and Inmate #3 as "tall and lanky . . . ."  *Id.* ¶ 34.  Eldridge's four attackers "were all known DMI Gang members."  *Id.* ¶ 32.

Another inmate, referred to as "Inmate #4", "stood outside of Cell 4's door like he was standing guard."  *Id.* ¶ 35.  When Eldridge tried to escape from his attackers, Inmate #4 "prevented [the door of Cell 4] from opening."  *Id.* ¶ 36.

During the attack in Cell 4, "Plaintiff was hit, kicked, stabbed with a makeshift knife . . . ."  *Id.* ¶ 33.  He was also "sexually assaulted with a makeshift knife . . . ."  *Id.*

According to Eldridge, the door to Cell 4 moved twice during the first attack, "like someone was trying to get out of it."  *Id.* ¶¶ 34, 36.  Eldridge alleges that Simpson observed or should have observed the door's movement, as well as other "signs of the attack, including noise generated by the attack, [and] screaming . . . ."  *Id.* ¶ 37.  Simpson's inaction constituted a "fail[ure of] his duty to intervene."  *Id.*

Further, "[o]nly inmates assigned to a cell are permitted inside the cell."  *Id.* ¶ 30.  And, "[i]t is against BCDC's policy for correctional officers to allow any inmates into cells that they are not assigned to sleep in."  *Id.* ¶ 31.  But, plaintiff asserts:  "The three inmates who were not assigned to Cell 4 entered in full view of Defendant Simpson, who failed to intervene despite having a duty to do so."  *Id.* ¶ 30.

At about 9:41:10 p.m., Eldridge "was able to crawl and escape Cell 4 into the Lower Day Room and run down to the exit door of the cell block."  *Id.* ¶ 38.  Simpson, "who was on the other side of the window" and had the ability to "open the exit door" to allow Eldridge to escape the cell

block, refused to do so.  *Id.* ¶ 39.  As a result, Eldridge was forced "to stand out in the Lower Day Room for the next four to five minutes", vulnerable to another attack.  *Id.* ¶ 40.

Inmates #1, #2, and #3 exited Cell 4 "about ten seconds after Plaintiff did and dispersed throughout the Lower Day Room."  *Id.* ¶ 41.  There was a towel stuck to the shoes of Inmate #3 "that came off on the floor, as he was walking in the Lower Day Room."  *Id.*  Eldridge alleges that Simpson witnessed the attackers leave Cell 4.  *Id.*  Yet, Simpson failed to intervene.  *Id.*

About ten seconds later, Eldridge's cellmate exited Cell 4.  *Id.* ¶ 42.  The cellmate "was picking up towels off the floor and throwing them away in one of the trashcans in the Lower Day Room."  *Id.*  According to plaintiff, the cellmate "was clearly cleaning something up inside of Cell 4 and throwing the towels he used away outside of Cell 4."  *Id.*  Further, plaintiff alleges that Simpson observed this conduct, which Eldridge characterizes as "destroying evidence."  *Id.*  Again, Simpson "failed to intervene."  *Id.*

At approximately 9:43 p.m., Inmate #1 "gave an order" to Eldridge's cellmate, who then re-entered Cell 4.  *Id.* ¶ 43.  Plaintiff notes that Inmate #1 is "seen on camera pointing . . . ."  *Id.*[4] Then, approximately 40 seconds later, two inmates, neither of whom was involved in the previous attack, entered Cell 4.  *Id.*  Next, "several other male inmates start[ed] gathering and/or looking into Cell 4."  *Id.*  Eldridge again emphasizes that Simpson observed this congregation of inmates around and in Cell 4, but he did not intervene.  *Id.*

Concurrently, Eldridge was still standing in the Lower Day Room.  *Id.* ¶ 44.  There, "Simpson could see that Plaintiff was dripping blood but never called a code or did anything to help him."  *Id.*

---

[4] The Court has not been provided with any video footage of the incident.

Moreover, "several gang members were taunting Plaintiff" in the Lower Day Room. *Id.* ¶ 45. In an effort "[t]o deescalate the situation, some Black inmates on the tier spoke with the DMI Gang members that were taunting Plaintiff and told them that Plaintiff would get his stuff and then leave through the exit door." *Id.* ¶ 46. Plaintiff returned to Cell 4 "for about ten seconds and then came back out to the Lower Day Room." *Id.* ¶ 47. Eldridge alleges that "[h]e was in a daze from the brutal physical and sexual assault he just suffered in Cell 4." *Id.*

At approximately 9:45:53 p.m., Inmate #1 "approached" Eldridge in the Lower Day Room "and began to attack him" for a second time. *Id.* ¶ 48. Other inmates, "some of whom were not involved in the first attack, joined in and chased Plaintiff into the corner next to the Sally Port door." *Id.* Eldridge "was brutally punched, kicked, and stabbed during this second attack." *Id.* Simpson witnessed this attack, as well, yet he did not intervene. *Id.* ¶ 49.

"Eventually, a Code II was called for the 4E Housing Unit and the attack [on Eldridge] ended." *Id.* ¶ 50.[5] The attackers then "dispersed, and the Sally Port door was finally opened for Plaintiff Eldridge to exit to safety." *Id.* Responding officers arrived at the scene, where Eldridge was "profusely bleeding from multiple stab wounds and other injuries." *Id.* ¶ 51.

Plaintiff "was escorted to Medical Treatment where he was evaluated by a nurse practitioner." *Id.* ¶ 52. The nurse practitioner called 911 "to emergently transport Plaintiff to an area hospital by ambulance." *Id.*

Eldridge's injuries included "stab wounds to the back of his left arm that was bleeding profusely, his left upper and lower arm, his left shoulder, and left hand; abrasions to both knees; anal bruising and itching; vomiting; headaches; chest pain radiating into left arm that felt like a heart attack; constipation; insomnia; . . . loss of appetite" and "bleeding and oozing from his

---

[5] Eldridge does not state who issued the Code II.

rectum." *Id.* ¶ 53. Eldridge describes his pain as "a 10/10—the worst possible on the pain scale." *Id.* Moreover, he "was unable to walk and had to use a wheelchair for five days" after the attacks. *Id.* ¶ 54. He also notes that he "suffered from speech issues and numbness of his left hand." *Id.* Since the attacks, Eldridge "had, and continues to suffer from: panic attacks, anxiety, difficulty sleeping, depression, and headaches, as well as severe mental and emotional anguish." *Id.* ¶ 55.

On June 9, 2022, "Captain Felicia Patilla and Lieutenant Timothy Davis reviewed video footage of the second attack on Plaintiff and attempted to identify the inmates that were involved." *Id.* ¶ 56. Moreover, "Police Officer Staines reported to BCDC and took pictures of Cells 11 and 19 and the area where the second attack on Plaintiff occurred." *Id.* ¶ 57.[6] But, neither Staines nor anyone else took photos of Cell 4, where the first attack occurred. *Id.*

BCDC officials also performed a "search of the Lower Day Room." *Id.* ¶ 58. "Sergeant Kim Mason found a pen with a sharpened point in the trashcan inside the housing unit." *Id.* According to Eldridge, his "Cellmate threw things away in that same trash can when he was cleaning up after the first brutal attack on Plaintiff in Cell 4." *Id.* Eldridge alleges: "Upon information and belief, this pen was used to sexually assault Plaintiff during that attack." *Id.*

## II. Procedural Background

As noted, suit was filed in the Circuit Court for Baltimore County on June 7, 2025. ECF 2; ECF 2-1 at 1. It is undisputed that the County was served with the suit on August 8, 2025. ECF 10-3 at 2. But, the parties dispute whether Simpson and Bryant were also served on that date.

To effect service, Eldridge engaged J&M Delivery, Inc. ("J&M"). ECF 18-1, ¶ 3. He claims that Simpson and Bryant were served at BCDC on August 8, 2025, when Correctional Officer Pamela Sterrette accepted service on their behalf.

---

[6] Plaintiff does not clarify which events, if any, occurred in Cells 11 or 19.

Rajendra Williams was the process server who hand delivered the suit and the summons on August 8, 2025. ECF 10-3 at 2, 4, 6, 8, 10, 12. Williams signed an Affidavit of Service for each defendant. *Id.* Moreover, she certified, "under penalty of perjury and upon personal knowledge, that the contents of the foregoing Affidavit of Service are true and correct." ECF 10-3 at 2, 4, 6, 8, 10, 12.

In particular, Williams avers that she served the County by hand delivery of the required documents and discovery requests to Janice Gray, the County Attorney's "Office Clerk," at the office of the County Attorney in Towson, Maryland, on August 8, 2025 at 3:40 p.m. *Id.* at 2. Her Affidavit also states: "Ms. Gray is authorized to accept service." *Id.*

With respect to service on Simpson and Bryant, Williams avers that on August 8, 2025, she went to BCDC, located at 702 Bosley Avenue in Towson, Maryland. *Id.* at 4, 6, 8, 12. And, she states that at 4:17 p.m. on that date, she hand delivered the required documents to "Officer Sterrette personally, at her office with the [BCDC] . . . ." ECF 10-3 at 4, 6. Moreover, Williams avers, *id.*: "Officer Sterrette stated that she is authorized to accept service." *Id.*[7]

Both Simpson and Bryant deny that they were served on August 8, 2025. They also claim, *inter alia*, that Sterrette was not authorized to accept service for them.

In their affidavits, Simpson and Bryant aver that they were "never served personally with the Complaint central to this case." ECF 13-2, ¶ 3; ECF 13-3, ¶ 3. Moreover, each states: "I have never given my consent for Correctional Officer Sterrette to accept any service of process on my

---

[7] Eldridge submitted with the Remand Motion a total of six affidavits of service (two for each defendant). The first three affidavits state that service was effected on August 8, 2025, for each defendant. They are signed and dated August 27, 2025. ECF 10-3 at 1–6. The latter three affidavits also state that service was effected for each defendant on August 8, 2025. But, they add descriptions of the physical appearances of Gray and Sterrette, and are signed and dated October 10, 2025. *Id.* at 7–12. Plaintiff explains that he amended the affidavits of service "in response to the circuit court's ruling on a Motion for Order of Default . . . ." *Id.* at 3.

behalf nor am I aware of any policy with my employer that would allow her to do so." ECF 13-2, ¶ 4; ECF 13-3, ¶ 4. In addition, Simpson and Bryant attest that they "did not become aware of this lawsuit filed against [them] until being contacted by Mr. Bradley Neitzel of the Baltimore County Office of Law on October 21, 2025." ECF 13-2, ¶ 5; ECF 13-3, ¶ 5. On that date, they claim to have authorized "the Baltimore County Office of Law to represent" them. ECF 13-2, ¶ 6; ECF 13-3, ¶ 6. Neitzel is one of three attorneys for the defendants who have appeared in the case, all from the Baltimore County Office of Law.

In addition, defendants have submitted the Affidavit of Pamela Sterrette. ECF 16-1. She avers "that accepting service from a Private Process Server is not within [her] job responsibilities." *Id.* ¶ 3.[8] Further, Sterrette states: "I hereby certify that neither Correctional Officer Hansel Simpson and Correctional Officer Elischa Bryant Defendants authorized me to accept service on their behalf." *Id.* ¶ 4. This assertion is at odds with the Affidavit of Williams, the process server, who averred that Sterrette claimed she was authorized to accept service for Simpson and Bryant. *See* ECF 10-3 at 4, 6.

Notably, Sterrette does not deny that she accepted service. ECF 18 at 2–3. Nor does she dispute that she told the process server that she was authorized to accept service. However, Sterrette fails to indicate whether she provided the documents she accepted to Simpson and Bryant and, if so, on what date and by what method.

---

[8] Defendants did not include Sterrette's Affidavit with their Remand Opposition. Instead, they filed it as a Supplement on January 20, 2026, over one month after the filing of their Remand Opposition and on the same date that Eldridge's Reply was due. *See* ECF 15; ECF 16. But, in plaintiff's Reply, he addresses Sterrette's Affidavit, indicating that he had an opportunity to consider it. ECF 18 at 2–3. Other than noting the "belated[]" nature of the Affidavit, plaintiff does not ask the Court to disregard it. *Id.*

As indicated, defendants do not dispute that the County was properly served on August 8, 2025. Therefore, under Maryland Rule 2-321(a), the County was required to respond to the suit by September 8, 2025. *See* ECF 18 at 5. But, the County failed to do so during the entire time that the case was pending in State court, *i.e.*, through November 5, 2025. As a result, during the pendency of the case in State court, plaintiff filed several motions seeking an order of default against all defendants. *See* ECF 11-22, ECF 11-26, ECF 11-29. In each instance, however, it appears there were technical deficiencies with the motions, so that an order of default was not entered. *See*, *e.g.*, ECF 11-24; ECF 11-31.[9]

As noted, Simpson and Bryant removed the case to this Court on November 5, 2025. ECF 1. Removal was predicated on "28 U.S.C. § 1331 and 28 U.S.C. § 1441(a) because the Complaint contains three federal claims brought under 42 U.S.C. § 1983." ECF 1 at 1. The County appears to have been in default at that time, for failure to respond to the suit.

On November 12, 2025—more than three months after the County was served—the County entered the case and filed its motion to dismiss. *See* ECF 7. In a "Statement Regarding Removal," filed by Simpson and Bryant on November 19, 2025 (ECF 8), they represent that the County was served on August 8, 2025, and that the County consented to removal. But, they advise that the County "did not join in the removal because more than 30 days [had] elapsed since it was served . . . ." *Id.*

The Remand Motion was timely filed on December 2, 2025. ECF 10. All three defendants joined in the Remand Opposition. ECF 13.

---

[9] Curiously, plaintiff claimed that defendants were served on August 25, 2025, rather than August 8, 2025. *See*, *e.g.*, ECF 11-22, ¶ 3; ECF 11-26, ¶ 3; ECF 11-29, ¶ 3. Moreover, plaintiff captioned two default motions to reflect a request for entry of default against "Defendant State of Maryland," which is not a defendant in the case. ECF 11-22; ECF 11-26. The text, however, indicates that plaintiff sought an order of default against the County, Simpson, and Bryant. *Id.*

### III. The Motion to Remand

### A.

Under 28 U.S.C. § 1441(a), the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  But, "removal jurisdiction raises significant federalism concerns." *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)).

In particular, federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). They "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Therefore, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper. *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377). And, Congress may not confer jurisdiction absent a constitutional basis. *Shamrock Oil*, 313 U.S. at 108–09 ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution.").  Accordingly, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding a case to state court. *Mulcahey*, 29 F.3d at 151.

Congress has conferred jurisdiction on the federal courts in several ways. Of relevance here, Congress has conferred on the district courts original jurisdiction over civil actions that arise

under the Constitution, laws, or treaties of the United States, in order to provide a federal forum for plaintiffs who seek to vindicate federal rights. *See* U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . ."); *see also* 28 U.S.C. § 1331; *Exxon Mobil Corp.*, 545 U.S. at 552. This is sometimes called federal question jurisdiction.

The burden of demonstrating jurisdiction and the propriety of removal rests with the removing party. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (Agee, J., concurring in part and dissenting in part), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc); *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT & T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). In this way, a failure of proof that jurisdiction exists cuts against the removing party. And, if "a case was not properly removed, because it was not within the original jurisdiction" of the federal court, then "the district court must remand [the case] to the state court from which it was removed." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

Even if the district court has original jurisdiction, removal is not an open-ended option. A notice of removal must be filed "within 30 days after the receipt by the defendant, *through service or otherwise,* of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b) (emphasis added).

14

For many years, the phrase "through service or otherwise" in 28 U.S.C. § 1446(b) was the subject of considerable disagreement, with federal courts taking one of two approaches. Some held that "the thirty day period allowed in § 1446(b) commences [only] upon proper service." *Schwartz Bros., Inc. v. Striped Horse Records,* 745 F. Supp. 338, 339 (D. Md. 1990) (collecting cases). Under this approach, "[m]ere receipt of the complaint, if it does not comply with the applicable state rules of service of process, [would] not start the clock ticking." *Id.* In contrast, other courts held that, "so long as the defendant receives actual notice of the substance of the litigation, proper service need not be effectuated for the thirty day clock of § 1446(b) to start." *Id.* at 340 (collecting cases). Under this approach, receipt of a courtesy copy of the complaint would start the removal clock. *See Bright v. Harford Cmty. Coll.,* CCB–11–985, 2011 WL 1984055, at *1 (D. Md. May 20, 2011).

In *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344 (1999), the Supreme Court explained that the thirty-day period is triggered by formal receipt of the complaint through service of process. *Id.* at 352–53. Put differently, the thirty-day removal period "is not triggered if the defendant receives a complaint unattended by formal service." *Samuels v. Two Farms, Inc.,* DKC-10-2480, 2010 WL 4103670, at *1 (D. Md. Oct. 18, 2010) (citing *Murphy Bros., Inc.,* 526 U.S. at 347). But, in *Elliott v. Am. States Ins. Co.*, 883 F.3d 384 (4th Cir. 2018), the Fourth Circuit recognized an exception to the "general rule" with regard to service on a statutory agent. It concluded that "when a statutory agent is served, the time to remove the case runs from the defendant's actual receipt of the complaint." *Id.* at 392 (citing *Gordon v. Hartford Fire Insurance Company*, 105 Fed. Appx. 476, 480 (4th Cir. 2004)).

Section 1446(b)(2)(C) of 28 U.S.C. is also pertinent. It provides: "If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served

defendant may consent to the removal even though that earlier-served defendant did not previously initiate or consent to removal."

The County did not seek to remove the case in the time provided by 28 U.S.C. § 1446(b). It now piggybacks on the removal by Simpson and Bryant and opposes the Remand Motion. But, the removal by Simpson and Bryant was untimely if, as plaintiff contends, they were served on August 8, 2025. For their part, Simpson and Bryant dispute service and assert that they did not learn of the suit until October 21, 2025, when a County lawyer informed them of the case.

On a motion to remand, a court has the "authority to look beyond the pleadings and consider summary-judgment-type evidence, such as the affidavits and the depositions accompanying either a notice of removal or a motion to remand." *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 819 (E.D. Va. 2005); *see United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (considering the entire record in evaluating a motion to remand); *Fraser-Dodoo v. Target Corp.,* PWG-19-3285, 2020 WL 3402295, at *2 (D. Md. June 19, 2020) (recognizing that the court may "consider facts outside the pleadings and [is] not limited to the allegations in a plaintiff's complaint when evaluating a motion to remand.").

Accordingly, the Court may consider the affidavits and other evidence submitted by the parties. However, if the available evidence is insufficient to resolve the issues pertinent to a motion to remand, the court may also permit the parties to conduct limited discovery as to the matter. As discussed, *infra*, that is the proper course here.

**B.**

Maryland Rule 2-121 provides for service of process "by delivering to the person to be served a copy of the summons, complaint, and all other papers filed with it" or "leaving a copy of the summons, complaint, and all other papers filed with it at the individual's dwelling house or

16

usual place of abode with a resident of suitable age and discretion". Md. Rule 2-121. Further, Maryland Rule 2-124 states: "Service is made upon an individual by serving the individual or an agent authorized by appointment or by law to receive service of process for the individual."

Eldridge contends that Simpson and Bryant were served on August 8, 2025, when Williams hand delivered process to Sterrette at BCDC. ECF 10 at 2. According to Eldridge, the case was removed 59 days beyond the time allotted under 28 U.S.C. § 1446(b). *Id.* at 3; *see* ECF 1. Therefore, he contends that the Notice of Removal filed on November 5, 2025, was untimely. And, he seeks a remand to the Circuit Court for Baltimore County, pursuant to 28 U.S.C. § 1447(c). ECF 10 at 4. Alternatively, Eldridge asks the Court to allow discovery as to the issues pertinent to the matter of service. *Id.* at 4–5.

As stated, Bryant and Simpson deny that they were served on August 8, 2025. In their affidavits, they state: "I hereby certify that I was never served personally with the Complaint central to this case." ECF 13-2, ¶ 3; ECF 13-3, ¶ 3. But, neither Simpson nor Bryant explains what is meant by the phrase "served personally." Simpson and Bryant may be suggesting that receipt of the Complaint from Sterrette, directly or indirectly, is not the same as being "served personally." Moreover, Simpson and Bryant do not provide the date on which they actually received the Complaint. Instead, they merely state that they "bec[a]me aware of this lawsuit" from Neitzel on October 21, 2025. *Id.* ¶ 5.

For its part, the County failed to respond to the suit for more than three months after it was served. There is no information before the Court as to when the County law office assigned the case to a lawyer. Although the Docket in the State case contains affidavits of service reflecting that service was effected on Simpson and Bryant at BCDC in August 2025 (ECF 11-15, Simpson;

17

ECF 11-17, Bryant), there is no explanation for the County's apparent delay in contacting Simpson and Bryant (*i.e.*, from August 8, 2025 to October 21, 2025) to notify them of the suit.

As plaintiff puts it: "Having waited 74 days, the County Attorney now argues that the officers are entitled to the benefit of their lawyers' delay in contacting them. If this approach is accepted, then the County Attorney will be able to engage in significant gamesmanship by simply withholding process and refusing to timely contact County employees." ECF 18 at 5.

John McIntyre, whose Affidavit was submitted by Eldridge with his Reply (ECF 18-1) is the co-owner of J&M, a courier and process service business founded by McIntyre and his brothers in 1997. *See* ECF 18-1, ¶¶ 1–2. In his Affidavit, McIntyre states: "The typical service on a correctional or police officer takes place at their place of work because home addresses are not known and typically not made publicly available by officers." *Id.* ¶ 5. Further, McIntyre avers: "When process servers attempt to serve correctional officers while they are working, including at the Baltimore County Detention Center, rather than interrupt their duties to call them to the public reception area, the facility typically has a designee for the purposes of accepting service. When a designee accepts service, our team is trained to obtain assurance that the designee is the authorized agent for acceptance of service on behalf of the officer. That assurance was obtained in this case." *Id.* ¶ 6. Moreover, McIntyre posits: "This has been the approach, including at Baltimore County Detention Center, for decades." *Id.* ¶ 7. He adds: "If courts do not accept the approach described above, serving correctional officers will become more time consuming, expensive, dangerous, and in some cases, impossible." *Id.* ¶ 8.

Presumably, neither Eldridge, his lawyer, nor J&M had access to the home addresses of Simpson and Bryant. *Id.* ¶¶ 5, 8. Service at their place of work, BCDC, would have been logical. *Id.* ¶ 6. And, Sterrette represented to the process server that she was authorized to accept service.

As McIntyre explains, it would be impractical to "interrupt [correctional officers'] duties to call them to the public reception area . . . ." *Id.*

C.

Defendants rely, *inter alia*, on *Elliott*, 883 F.3d at 384. *See* ECF 13-1 at 2–3. In *Elliott*, the Fourth Circuit concluded that, when a statutory agent is served, the filing period for removal commences when the defendant receives the complaint, and not from the date of service on the statutory agent. *Elliott*, 883 F.3d at 394.

The Court defined a statutory agent as "an agent designated by law to receive litigation documents and other legal notices for a nonresident corporation." *Id.* at 390 (citing Black's Law Dictionary (10th ed. 2014)) (cleaned up). The Court stated: "The general rule, as established by the Supreme Court in *Murphy Brothers*, is that the time for counting the days for filing notice of removal under § 1446(b) starts when the defendant is formally served with the summons and complaint making the defendant an official party to the action and requiring the defendant to appear." *Id.* at 391 (citing *Murphy Bros., Inc.*, 526 U.S. at 347–48). However, the Court noted that in *Gordon*, 105 Fed. Appx. at 480, it recognized an exception to the general rule for statutory agents, "and held that when a statutory agent is served, the time to remove the case runs from the defendant's actual receipt of the complaint." *Elliott*, 883 F.3d at 392 (citing *Gordon*, 105 Fed. Appx. at 480). The Court said: "Serving a statutory agent does not guarantee that the defendant is provided with actual notice of the complaint or adequate time to decide whether to remove a case. To hold that the filing period commences when the statutory agent is served, therefore, would allow for the filing deadline to pass before the defendant actually receives a copy of the complaint—the exact situation Congress previously sought to avoid when it amended § 1446(b) to its current state." *Elliott*, 883 F.3d at 393 (citations omitted).

19

In other words, "'the defendant's right to a federal forum should not depend upon the rapidity and accuracy with which the statutory agent informs its principal of the commencement of litigation against it.'" *Id.* (quoting *Medina v. Wal-Mart Stores, Inc.*, 945 F. Supp. 519, 521 (W.D.N.Y. 1996)). But, the Fourth Circuit did not address whether its ruling applies to non-statutory agents. Indeed, it expressly distinguishes between a statutory agent and a process agent or registered agent. *Elliott,* 883 F.3d at 390 ("Conversely, a 'process agent' or 'registered agent' is defined as 'a person authorized to accept service of process agent on behalf of another.'") (quoting Black's Law Dictionary (10th ed. 2014)); *see Goodloe v. James River Ins. Co.*, No. CV DKC 21-1318, 2021 WL 3406522, at *3 (D. Md. Aug. 4, 2021) (applying *Elliott*, and reasoning that "[s]erving a statutory agent does not guarantee that the defendant is provided with actual notice of the complaint or adequate time to decide whether to remove a case."); 14C Charles Alan Wright, et al., Federal Practice and Procedure § 3731 (4th ed. Apr. 2017) ("At one time it was not clear whether service on a statutory agent . . . was sufficient to commence the time period for removal . . . . Realistically speaking, of course, statutory agents are not true agents but merely are a medium for transmitting the relevant papers. Accordingly, it now appears to be settled law that the time for removal begins to run only when the defendant or someone who is the defendant's agent-in-fact receives the notice via service, as prescribed in the *Murphy Brothers* case.").

Plaintiff has failed to address *Elliott* in his Reply. But, defendants do not contend that Sterrette was a statutory agent. And, in contrast to a statutory agent, "[a]s a general rule, service upon an authorized agent satisfies due process by providing the defendant with actual notice of the suit." *Lisson v. ING GROEP N.V.*, 262 F. App'x 567, at 569 (5th Cir. 2007). Therefore, if Sterrette was authorized to accept service on August 8, 2025, the removal clock would have started to run on that date. *See Skidaway Assocs., Ltd. v. Glens Falls Ins. Co.,* 738 F. Supp. 980, 982 (D.S.C.

20

1990) (drawing a distinction between service on a "statutory agent," and an "agent[] designated and selected by a party to receive process" for purposes of starting the removal filing period).

As discussed, a federal court "should construe removal statutes narrowly, [with] any doubts . . . resolved in favor of state court jurisdiction." *Barbour v. Int'l Union*, 640 F.3d 599, 617 (4th Cir. 2011) (en banc), *abrogated in part on other grounds by* the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011); *see also Elliott*, 883 F.3d at 390 ("Doubts about the propriety of removal should be resolved in favor of remanding the case to state court and in doing so, removal statutes must be strictly construed."); *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 333–34 (4th Cir. 2008) (noting that the Fourth Circuit's conclusion was "consistent with the well-established principle that [it was] obliged to construe removal jurisdiction strictly because of the significant federalism concerns implicated and that if federal jurisdiction is doubtful, a remand to state court is necessary") (citations and quotations omitted); *Mulcahey*, 29 F.3d at 151 (stating that courts must "strictly construe removal jurisdiction").

## D.

As Eldridge puts it, "the defense has generated, at best, a factual dispute as to whether or not the individual officers were properly served when Officer Sterrette accepted process and advised the process server that she was authorized to accept it for the individuals." ECF 18 at 3. Therefore, in the alternative, plaintiff asks the Court to "order that discovery be opened now in order to resolve the factual disputes at the hear [sic] of the present motion." ECF 18 at 6.

Federal courts wield an inherent power to "control the judicial process and litigation," which extends to discovery. *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 42–50 (1991). A court has "broad discretion to tailor

21

discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Moreover, jurisdictional discovery, that is, discovery concerning facts upon which the court's jurisdiction is based and similar to that which plaintiff requests here, is within a district court's discretion to grant or deny. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 402–03 (4th Cir. 2003); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Alumium Factory",* 283 F.3d 208, 216 n. 3 (4th Cir. 2002).

In my view, the record as to service of Simpson and Bryant is muddled. To begin, Sterrette does not dispute that she accepted the lawsuits for them. But, she fails to specify in her Affidavit what she did with the lawsuits upon receipt of them. This is a glaring omission. Moreover, Sterrette now disputes that she was authorized to accept service. Yet, she does not dispute that on August 8, 2025, she represented to the process server that she was authorized to accept service.

Questions abound. These include how many times Sterrette has accepted service for a correctional officer and when; the basis upon which Sterrette believed she was authorized to accept service on behalf of Simpson and Bryant when she did so on August 8, 2025; when and how Sterrette learned that she was not authorized to accept service in this case; what did Sterrette do with the lawsuits after accepting service of them; whether Sterrette informed Bryant and Simpson of the suits and, if so, when and how; and what, if any, policies were in place at BCDC in August 2025 concerning service of lawsuits.

Accordingly, I shall grant plaintiff's request for limited discovery pertaining to service of Bryant and Simpson, and when and how they learned of the lawsuit.

### IV. Conclusion

For the reasons stated above, the Court will allow the parties to conduct limited discovery on the issues raised by the Remand Motion, to include depositions, interrogatories, and document

production, to ascertain whether or not Bryant and Simpson were served on August 8, 2025, and when they acquired actual notice of the lawsuit.  ECF 10 at 6.

The discovery must be completed within 45 days of the date of the corresponding Order. Within 60 days of the docketing of the Order, plaintiff may file a supplemental Remand Motion. Defendants may file a supplemental opposition within fourteen days of the filing of plaintiff's supplement, and plaintiff may file a supplemental reply within fourteen days of the filing of defendants' supplemental opposition.

The Court shall defer ruling on the merits of the Remand Motion and the Motion to Dismiss until the limited discovery and supplemental briefing are completed.

An Order follows, consistent with this Memorandum Opinion.

Date: April 15, 2026

_____/s/_____
Ellen L. Hollander
United States District Judge

23